IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA LEE,<br><br>    Plaintiff,<br><br>   v.<br><br>KAISER FOUNDATION HEALTH PLAN LONG TERM DISABILITY PLAN,<br><br>    Defendant.<br>_____/<br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>    Real Party in Interest.<br>_____/ | No. C 09-02176 SI<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Currently before the Court are the parties' cross motions for summary judgment. As discussed below, the Court GRANTS in part the motion by defendant Kaiser Foundation Health Plan and real party in interest Metropolitan Life Insurance Company (collectively "defendants" or "MetLife"), and DENIES plaintiff's motion for summary judgment.

**BACKGROUND**

Plaintiff was a recruiting coordinator at Kaiser Foundation Health Plan, Inc. Administrative Record ("AR") 2332. She suffered from "acute stress/depression," for which she was treated in May 2003. AR 769. Plaintiff also suffered two workplace injuries. In June 2004, she slipped and fell in the lobby of the building where she worked. AR 2241. She was diagnosed with "cervical spine strain,

bilateral trapezius strain" as well as "right knee strain/contusion, bilateral wrist strain." AR 774. She complained of headaches, ringing in the left ear, left side pain, right arm pain, as well as pain in both legs, both wrists, and both ankles. AR 782. At the end of June 2004, she was complaining that her left hand digits were numb, that she had continuing headaches, loss of balance, and loss of sense of direction. AR 790. She complained that the left side of her body was weak and that she could not remember things that she knew that she should know. AR 790. She was diagnosed with left wrist sprain and possible tendinitis, and her physician noted that she was improving more slowly than expected. AR 791. She worked for one week during August, but otherwise was on total temporary disability until October 15, 2004. AR 2241.

Plaintiff was injured again on October 27, 2004, when she was hit by a door. AR 2241. Plaintiff stopped working on February 28, 2005, and submitted a claim for disability benefits in August 2005. AR 2331–33. She did not complete required documentation for her claim right away. AR 2329. In October 2005, she sent an employee statement in support of her claim. She identified February 28, 2005 as her last day of work, stated that she was disabled as of June 4, 2005, and explained that she could not work due to "repetition/pain/stress/depression/memory problems." AR 2323. In December, MetLife received an attending physician's statement. AR 2320–22. The physician had advised plaintiff to return to work as of October 18, 2005. AR 2321. Three days after receiving the physician statement, on December 8, 2005, MetLife informed plaintiff that it could not make a claim determination if she did not file additional requested documentation. AR 2319.[1]

Both parties agree that in November 2006 plaintiff was fired from Kaiser, having been accused of "blowing up" at a coworker. *See* Plaintiff's Motion at 18; MetLife Reply at 11. On April 12, 2007,

---

[1] The AR shows that plaintiff was working or released back for work at various points in 2005 and 2006. *See, e.g.*, AR 2255 (plaintiff on modified duty on August 10, 2005); AR 2251 (treating physician released plaintiff to work as of October 3, 2005); AR 2321 (advised to return to work on October 18, 2005); AR 2238 (after being out of work for a week, on February 16, 2006 physician considered plaintiff able to work and notes plaintiff wanted to return to work); AR2151 (on November 9, 2006, plaintiff was on return to modified work status, but noting that plaintiff was recently fired); AR 2149 (on November 22, 2006 physician noted plaintiff was on return to modified work status). Plaintiff recognizes that the record has "a lot of return to work/modified work attempts, but no coherent list of when Ms. Lee was working and not working." Plaintiff's Motion at 13 fn. 8. Despite this recognition, plaintiff did not provide the Court with a list of – or at least her version of – the periods when she was at work, at work with modified conditions, or off work due to limitations from 2004 through 2007.

2

plaintiff had cervical fusion surgery. AR 2095. Plaintiff reopened her claim in August 2007. AR 199. She informed MetLife that she had been fired from Kaiser and was currently receiving worker's compensation. AR 198–99. She submitted some supporting documentation. AR 2303–17; 2287–2300; 2225–82.

On November 21, 2007, MetLife denied her claim, explaining that plaintiff's medical records did not establish that she was disabled under the Plan. AR 2219–24. Plaintiff submitted additional documentation. AR 2197–2200, 2206–18. On January 15, 2008, MetLife again sent plaintiff a letter saying that her claim was being denied. AR 2094–96. In that letter, MetLife stated: "Disability is supported from April 12, 2007, the date of the cervical fusion, through September 11, 2007." AR 2095. However, still using plaintiff's originally-identified February 28, 2005 date as plaintiff's last day of work, MetLife explained that this period of disability "began after [plaintiff's] eligibility for LTD insurance ended as [she was] previously off work for over two years." *Id.*

On July 10, 2008, plaintiff appealed and sent over 1500 pages of supporting documentation. AR 631–2093. MetLife retained three independent physician consultants ("IPCs") to provide medical opinions as to plaintiff's restrictions and limitations. One of the IPCs, Dr. Topper, concluded that plaintiff suffered some physical limitations on her ability to work between March 1, 2005 and April 12, 2007. He found that she would have been totally disabled for the two month following her surgery, until June 12, 2007, and that her radicular symptoms were completely resolved following the surgery. AR 599–601. The second IPC, Dr. Murphy, concluded that psychiatric records supported a conclusion that plaintiff suffered from psychiatric impairment from February 28, 2005 onward. A third IPC, Dr. Schroeder, agreed. AR 442–50.

Ultimately, MetLife determined that plaintiff was disabled by a psychiatric condition and not unable to work due to a continuous physical impairment. AR 424, 429. Under the terms of the plan, this entitled plaintiff to 24 months of benefits and no more. MetLife then conducted a separate employability analysis, to see if plaintiff could qualify for ongoing benefits after the 24 month period based on physical impairments. She would have needed to be unable to perform any occupation, not merely her own. The analysis identified four suitable occupations in addition to plaintiff's own occupation. AR 428–29.

On February 9, 2009, MetLife informed plaintiff of its conclusions: that she was disabled as of March 1, 2005 due to a psychiatric condition, which meant that she would receive LTD benefits from August 27, 2005 (the end of the Elimination Period) until August 27, 2007. AR 424–30. But she was not physically disabled. Although in a previous letter, MetLife had stated that disability was supported "from April 12, 2007, the date of the cervical fusion, through September 11, 2007," AR 2095, it now determined that the cervical fusion disability lasted only through June 12, 2007 and that plaintiff could not recover any additional benefits. AR 426.

Plaintiff filed this lawsuit, asking for review of MetLife's denial of benefits. She argues that her chronic depression and the two injuries she sustained *combined* to produce "co-morbid physical impairments, including post-concussion syndrome, cervical disc degeneration including C5-6 radiculopathy (for which she underwent [a spinal] fusion), chronic and disabling headaches (either post-concussive or cervicogenic in nature), and chronic neck, back and shoulder pain." Plaintiff's Motion at 2. Thus, she is not disabled only because of a psychiatric condition and the 24-month limitation of benefits does not apply.

MetLife has moved for summary judgment, arguing that its decisions should be affirmed under the abuse of discretion standard and arguing that summary judgment should be entered on MetLife's counterclaim seeking repayment of benefit overpayments made to plaintiff in light of her workers compensation payments.

**DISCUSSION**

**I.  Standard of review**

The threshold issue is whether the Court should review the decision to deny further benefits *de novo* or under the abuse of discretion standard.[2] The Court reviews benefits denials de novo "unless the

---

[2] Plaintiff has filed a motion for summary judgment, but argues that the standard of review is *de novo*. *De novo* review on ERISA benefits claims is typically conducted as a bench trial under Rule 52. *See, e.g., Lafferty v. Providence Health Plans*, 706 F. Supp. 2d 1104, 1109 (D. Or. 2010) ("Under Rule 52, the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true."). Defendant and MetLife state that they have filed their motion under Rule 52, but ask the court to affirm that the denial of benefits was not an abuse of discretion. "When the decision to grant or deny [ERISA] benefits is reviewed for abuse of

4

benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits"; if the plan does grant such discretionary authority, the Court reviews the administrator's decision for abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Salomaa v. Honda Long Term Disability Plan*, 637 F.3d 958, 965 (9th Cir. 2011). Under the abuse of discretion standard, a decision is not "arbitrary and capricious," unless it is "'not grounded on any reasonable basis.'" *Id*. (as amended by *Salomaa v. Honda Long Term Disability Plan,* 2011 U.S. App. LEXIS 10890 (May 26, 2011) (quoting *Horan v. Kaiser Steel Retirement Plan*, 947 F.2d 1412, 1417 (9th Cir. 1991)).

However, where the administrator of the benefits plan has a conflict of interest, the abuse of discretion review is further modified and the Court must review the benefits decision "skeptically." A conflict of interest arises where:

> the same entity makes the coverage decisions and pays for the benefits. This dual role always creates a conflict of interest, [citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)], but it is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." [*Glenn*, 554 U.S. at 117]. The conflict is less important when the administrator took "active steps to reduce potential bias and to promote accuracy," *id*., such as employing a "neutral, independent review process," or segregating employees who make coverage decisions from those who deal with the company's finances. [*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969 n.7 (9th Cir. 2006) (en banc).] The conflict is given more weight if there is a "history of biased claims administration." *Glenn*, 554 U.S. at 117. Our review of the administrator's decision is also tempered by skepticism if the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim. (citations omitted).

*Harlick v. Blue Shield*, 2011 U.S. App. LEXIS 17844, *12-13 (9th Cir. Aug. 26, 2011).

The "skeptical" abuse of discretion standard has been explained by the Ninth Circuit as follows:

> [W]e consider whether application of a correct legal standard was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." [quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)]. That standard makes sense in the ERISA context, so we apply it, with the qualification that a higher degree of skepticism is appropriate where the administrator has a conflict of interest.

*Salomaa*, 637 F.3d at 967.

---

discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999), overruled on other grounds in *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 966-69 (9th Cir. 2006) (en banc)); *Hughes v. Unumprovident Corp.*, No. C 07-4088 PJH, 2008 WL 4452140, * 4 (N.D. Cal. 2008). The Court, therefore, will determine what standard of review applies. If abuse of discretion applies, the Court will treat the parties' motions as ones for summary judgment under Rule 56.

5

### A. Discretion is Conferred on MetLife

Here, the Administrative Record contains a Certificate of Insurance ("COI", AR 1–34)[3], a Summary Plan Description ("SPD") (AR 44–194), and a Plan document ("Welfare Benefits Plan" or "WBP," AR 538–50).[4] The WBP provides that the Plan fiduciary "shall have full and complete discretionary authority with respect to its responsibilities under the Plan . . . . All actions, interpretations, and decisions of a Named Fiduciary or a delegate thereof shall be conclusive and binding on all persons and shall be given the maximum possible deference allowed by law." AR 544. Similarly, the "additional information section" attached to the Certificate of Insurance states that:

> [i]n carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

AR 41; *see also* AR 34 ("This is the end of the certificate. The following is additional information."). Both parties admit that the Summary Plan Description is silent as to discretion.[5]

Following oral argument, the parties submitted supplemental briefing and evidence regarding the standard of review. As part of its submission, defendant filed a "Supplemental Declaration of Joanne Carroll re Documents Applicable to Long Term Disability Benefits." Docket No. 79. In her supplemental declaration Ms. Carroll explains that plaintiff's long-term disability benefits were provided under the Kaiser Permanente Flexible Benefits Plan ("Flexible Benefits Plan" or "FBP"), and supplement

---

[3] In her opening brief, plaintiff recognized that the Certificate of Insurance is logged at AR 1. In her reply brief and opposition to MetLife's cross motion, however, plaintiff argues that the record does not demonstrate what the document that starts at AR 1 actually is. On AR 2, however, the document clearly states that it is a Certificate of Insurance. The Supplemental Carroll Declaration makes it clear that the document at AR1 - 34 is an amended exhibit to the MetLife group policy that provided LTD coverage to plaintiff and that document includes the COI applicable to Ms. Lee's claim. Supp. Carroll Decl. ¶ 17 & Ex.K.

[4] In her opening brief, plaintiff recognized that the WBP at AR 538 is the Plan at issue. In her reply brief and opposition to the cross motion, however, plaintiff argues that the WBP is only an umbrella plan and it does not provide the LTD benefits at issue. In light of this argument, the Court allowed the parties to submit additional briefing and evidence regarding what plans and documents are at issue in this case.

[5] In her supplemental declaration, Ms. Carroll admits that defendant produced the incorrect SPD in the administrative record and attaches the correct one at Exhibit M. Plaintiff does not argue that the correct SPD attempts to withdraw discretion provided in the WBP and COI. Instead, the newly produced SPD is, like the one in the AR, silent on the issue of discretion.

6

and amendments which made the FBP applicable to plaintiff's work unit. *See* Supp. Carroll Decl., ¶¶3-6 and Exs. A-D thereto. Carroll also states that when an employee selects benefits under the FBP the employee "thereby" becomes a participant in the "umbrella" Kaiser Permanents Welfare Benefits Plan. *Id*., ¶¶ 9-11 & Exs. E-G thereto. The Welfare Benefits Plan is the Plan produced at AR 538-50 and, as discussed above, confers discretion for determining eligibility on the Plan administrator. *See* AR at 544.

In addition to Carroll's assertion that employees selecting benefits under the Flexible Benefits Plan "thereby" become participants in the Welfare Benefits Plan – and covered by the discretion provided by the WBP – the appendices to the WBP support MetLife's argument. Specifically, Appendix A at AR 550 to the WBP lists the "benefit programs" that are part of the Plan and includes "Metropolitan Life Insurance Company Contract #95910, 95911." Carroll's supplemental declaration attaches the MetLife policy insuring group long term disability, and the group policy number, as amended, is "95910-G." Carroll Decl., 14-15 & Exs.I-J; *see also id.*, Exs. K-L (the original and amended "Your Employee Benefit Plan Kaiser Foundation Health Plan, Inc., Long Term Disability Benefits," document incorporating the certificates of insurance). This evidence establishes that plaintiff's LTD benefits are covered by the WBP.

Plaintiff's main response is that nothing in the record – other than Ms. Carroll's declaration – supports tying plaintiff's LTD benefits under Flexible Benefits Plan to the discretion provided in the Welfare Benefits Plan. However, as noted above, the Appendix to the Welfare Benefits Plan at AR 550 lists the MetLife policy number providing the LTD benefits. Those benefits were offered under the "cafeteria-style" Flexible Benefits Plan, but the FBP is itself included under the umbrella of the WBP. Plaintiff also challenges Ms. Carroll's declaration and the authenticity of the documents she submits in order to argue that the WBP's express discretion should not apply to plaintiff's claim. *See* Plaintiff's Supp. Reply Re Standard of Review (Docket No. 80) at 9-13. However, the authenticity of the records at issue – including the determinative the WBP and the COI which were produced in the administrative record – is sufficiently established by Ms. Carroll's declarations made in her capacity as a Benefits/Consultant who was involved with the creation of the WBP and familiar with Kaiser's employee

7

benefit plans.[6] *See* Carroll Decl., ¶ 1; Supp. Carroll Decl., ¶ 1; *see also* Fed. Rule of Evid. 902(11).

The Court also notes that the certificate of insurance supports giving discretion to MetLife as claims administrator. As noted above, the document containing the certificate effective as of December 1, 2004, provides in its "additional information" section that discretion is provided to the administrator to determine eligibility. AR 41. Plaintiff attempts to undermine this fact by arguing that the discretion language is not in the certificate of insurance itself – which ends at AR 34 – and notes that the prior certificate of insurance, *see* Carroll Decl., Ex K, provided for discretion on the face of the certificate. *Id*., pg. ii. The Court agrees that, standing alone, the certificate of insurance document would not be enough to confer discretion on MetLife, but finds it is consistent with and supports the provision of discretion granted in the Welfare Benefits Plan.[7]

Additionally, the Court concludes that the SPD and the Flexible Benefits Plan's silence does not create a conflict with the Welfare Benefits Plan and Certificate of Insurance. In the Ninth Circuit, where the terms of different plan documents are in conflict, the document granting the most protection to the insured governs. *See Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1145 (9th Cir. 2002). This rule applies when documents are affirmatively in conflict, not necessarily when one document is silent. *See Lafferty v. Providence Health Plans*, 706 F. Supp. 2d 1104, 1111 (D. Or. 2010) ("The Ninth Circuit, and the majority of other jurisdictions which have considered this issue,

---

[6] Plaintiff also challenges the authenticity of the Appendices attached at AR 500 to the Welfare Benefits Plan, noting that Appendices A and B first appear at AR 549 and are blank, but then subsequently appear filled out at AR 550 without an internal page number or date on the page. *See* Plaintiff's Supp. Reply at 11. The WBP and all of its appendices were produced as part of administrative record. The document was clearly central to defendant's position regarding discretion and plaintiff had the opportunity to explore issues concerning the initial blank appendix page and the subsequently completed appendix page at AR 550. Having failed to do so, she cannot now attempt to defeat summary judgment on this ground.

[7] Plaintiff also argues that because the California Insurance Commissioner withdrew approval of similar discretionary language in certificates in 2004, the Court should disregard that language. Plaintiff, however, does not demonstrate that the California Insurance Commissioner's decisions are binding in the ERISA context. *See, e.g., Saffon v. Wells Fargo*, 522 F.3d 863 (9th Cir. 2008) (questioning whether federal law permitted states to nullify an ERISA plan's grant of discretionary authority). Moreover the Court notes that the language is included only in the "additional information" section of the certificate and standing alone would not confer discretion. As it is not relying on plaintiff's evidence regarding the Commissioner's actions, the Court need not consider MetLife's objections to that evidence. Similarly, the Court has not relied on the other evidence MetLife objects to in the Padway Declarations, and therefore overrules defendants' other objections. Docket Nos. 60, 75.

8

have concluded that silence in the SPD regarding language contained within the plan is not necessarily a conflict."), *reversed on other grounds*, 2011 U.S. App. LEXIS 11682 (9th Cir. Or. June 7, 2011); *Daic v. Metro. Life Ins. Co.*, 458 F. Supp. 2d 1167, 1173 & n.5 (D. Hawaii 2006) ("The Plaintiff has cited no statute or caselaw that requires particular language to be in a particular place in the ERISA plan."); *cf. Atwood v. Newmont Gold Co. Inc.*, 45 F.3d 1317, 1321 (9th Cir. 1995) (silence regarding discretion in an SPD is acceptable, since the summary is required only "to describe accurately the circumstances or actions which could affect an employee's eligibility for benefits"), *overruled on other grounds by Abatie*, 458 F.3d at 966.

Plaintiff points to language in the SPD that she believes makes the SPD's silence regarding discretion into an actual conflict with the terms of the other Plan documents. The SPD states that a disability claimant must provide Kaiser with "medical documentation certifying [her] disability"; then it provides that MetLife has the right to require evidence that the claimant has applied for other benefits for which she is eligible. AR 183. Plaintiff argues that this is an express limitation on MetLife's role — that *all* she had to do was provide certain required documents and that MetLife may not deny benefits merely because it disagrees with the medical documentation. Plaintiff does not explain who has the right to determine whether the medical documentation actually certifies a qualifying disability, however, and it is not obvious from the SPD that MetLife does not have that discretion. While the statement in the SPD would not be enough to lead the Court to grant abuse of discretion review on its own, it certainly does not conflict with the terms of the WBP and COI.

Finally, plaintiff argues that the standard of review in this case is controlled by *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154 (9th Cir. 2001). In that case, the claims administrator attempted to confer discretion upon itself by issuing a revised SPD granting discretion where the underlying Plan did not provide discretion. The Ninth Circuit rejected that attempt, noting that because the Plan contained an integration clause the SPD could not alter a substantive provision of the Plan, *e.g.*, providing no discretion to the claims administrator. *Id.* at 1161. The Court also held that even absent the integration clause, the SPD could not confer discretion upon the administrator where the SPD was not adopted in conformance to the Plan's requirements (as in that case, the plan required that any amendments be signed by both parties, but the SPD was issued and signed only by the administrator).

9

1 *Id.* Here, however, the WBP provides discretion. The WBP includes within its umbrella the provision
2 of LTD benefits under the FBP and MetLife contract. *See* AR 550. The additional information attached
3 to the COI also provides discretion. The SPD and the FBP are both silent on discretion. *Grosz-Salomon*,
4 therefore, is inapposite as MetLife is not unilaterally attempting to provide itself with discretion through
5 subsequent amendments to Plan documents.

6 For the foregoing reasons, the Court concludes that the relevant Plan documents at issue confer
7 discretion on MetLife as the claims administrator to determine eligibility for benefits. As such, this
8 Court's review is for abuse of discretion.

### B. Conflict of Interest

Having determined abuse of discretion is the standard, the Court must next determine if it applies that standard skeptically in light of a conflict of interest. As MetLife is the entity that makes coverage decisions and pays for the benefits, a conflict exists. *Harlick v. Blue Shield*, 2011 U.S. App. LEXIS 17844, *12. This conflict is given less weight if the administrator undertook a neutral, independent review process. *Id.* at *12-13. The conflict is given more weight if there is a history of biased claims administration, if the administrator gave inconsistent reasons for a denial, if the administrator failed to provide a full review of a claim, or failed to follow proper procedures in denying the claim. *Id.*, at *13; *see also Glenn*, 554 U.S. 118.

Plaintiff makes two arguments in support of her contention that MetLife's review was biased and should be heavily scrutinized. First, plaintiff argues that MetLife has not affirmatively shown that its claim administrative process is fair and neutral. Second, in her reply plaintiff argues that the reports of two of the MetLife IPCs – Dr. Topper and Dr. Murphy – show that they are biased in favor of denying claims. The Court rejects both of these arguments for the reasons discussed below.

### i. Claims Administration Process

Plaintiff first argues that 29 C.F.R. § 2560.503-1(b)(5) requires MetLife to have "administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been

10

applied consistently with respect to similarly situated claimants"; (2) that 29 C.F.R. § 2560.503-1(m)(8) makes clear that documentation of these processes and safeguards is "relevant" to the claim; (3) that 29 C.F.R. § 2560.503-1(h)(2)(iii) requires such documentation be produced upon the request of the beneficiary following an adverse benefit determination; and (4) that 29 C.F.R. § 2560.503-1(h)(2) makes clear that MetLife's failure to produce documents regarding its internal claims processing procedures means that the "claims procedures will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review." MetLife responds that these regulations apply to *plans* not to third-party claim administrators (such as MetLife), and that all of the Plan's claims procedures were disclosed to plaintiff. The Court agrees with MetLife's understanding of 29 C.F.R. § 2560.503-1(b)(5), which is clearly directed at "[e]very employee benefit plan." Therefore, plaintiff's argument fails.[8]

Second, plaintiff points to MetLife's failure to disclose its quality control protocol and the procedures by which MetLife ensures that its claim reviewers decide claims accurately. Motion at 6; *see also* Docket No 48 at 5 (granting plaintiff's motion to compel MetLife to produce documents re quality control). Plaintiff argues that because MetLife has produced nothing in response to this Court's order granting plaintiff's motion to compel (MetLife asserted no responsive documents existed), MetLife has failed to show it maintains reasonable claim procedures. Motion at 6 (citing *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009)). However, there is nothing in the administrative record itself that discloses that plaintiff did not receive a fair review or that MetLife otherwise maintains unreasonable claims procedures. *But see Montour*, 588 F.3d at 633-35 (fact that defendant failed to present extrinsic evidence regarding efforts to ensure an accurate claims process, where significant evidence in the record established bias in that process, was factor against deference to administrator's

---

[8] Relatedly, plaintiff also asserts that MetLife's failure to disclose under 29 C.F.R. § 2560.503-1(m)(8) the Reed Review Guidelines relied on by Dr. Topper prevents MetLife from arguing that it has demonstrated that its claims procedures are fair. MetLife argues that the Guidelines are "not a MetLife document" and "not part of the administrative record" and thus did not need to be disclosed. The Court finds that the Guidelines are one document removed from what was in the administrative record. That is to say, MetLife considered the report of Doctor Topper (and, in fact, agreed with all of its conclusions), and Dr. Topper in turn relied on the Guidelines "to support [his] final opinion." AR 604. The Court suspects that Dr. Topper also relied on his medical training, including textbooks he read in medical school, and also perhaps treatises that he consulted while reviewing plaintiff's case. Whether or not the regulations would consider the guidelines to be a "relevant" document that should have been disclosed, the Court is unwilling to find on the basis of MetLife's decision not to disclose this document, that the claims *procedures* in this case failed to provide plaintiff with a full and fair review.

11

decision).[9]

The administrative record undisputedly shows that plaintiff filed an original claim (in August 2005), but she failed to provide information necessary to substantiate her claim. Plaintiff sought to and MefLife allowed her to reopen her claim in August 2007, following her cervical fusion surgery. MetLife reviewed the claim and, after denying it, considered plaintiff's appeal. MetLife considered the 1,500 pages of additional documents she submitted in support of her appeal and hired the three IPCs to review her claim. MetLife shared the IPC reports with plaintiff's physicians for their response, as well as her attorney, and concluded that plaintiff had been disabled by her mental condition but not disabled pursuant to a physical disability. The claim procedures implemented by MetLife in reviewing plaintiff's claim do not appear to be unreasonable.[10]

### ii.  Bias of Dr. Topper and Dr. Murphy

In her reply, plaintiff raises the additional argument that MetLife abused its structural conflict by employing biased consultants, specifically Drs. Topper and Murphy. *See* Plaintiff's Reply at 12-16. The bias of these consultants is established, plaintiff argues, by the fact that in the 25 Dr. Topper reports produced by MetLife, Dr. Topper agreed with a treating physician that a claimant was disabled only once and Dr. Topper earns approximately $500,000 a year from MetLife. Plaintiff's Reply at 14. For Dr.

---

[9] Plaintiff also complains that MetLife has refused to produce the instructions it provides to its IPCs, despite being ordered by the Court to do so. *See* Reply at 13-14. Plaintiff argues that the Court should assume those standards are unreasonable and/or lead to biased decisions. *Id.* The Court did order MetLife to produce documents reflecting the standards to be applied by its reviewers in assessing specific disability claims. *See* July 14, 2010 Order at 3-4, Docket No. 48. MetLife admits it has not produced these documents, because the parties could not agree to a stipulated protective order. *See* MetLife Motion at 14, n.6. If MetLife was in violation of this Court's order due to its failure to disclose the documents and seek entry of a protective order, it was Plaintiff's burden to raise this issue to the Court (*e.g.*, through a formal request for issue preclusion sanctions, a Rule 56(f) motion, etc.). Plaintiff has failed to do so. The Court, therefore, will not assume the non-disclosed documents support plaintiff.

[10] Plaintiff challenges some of the decisions reached by the IPCs who reviewed plaintiff's records and discussed her claims with her treating physicians, arguing that the IPCs failed to adequately address the diagnoses of her treating physicians. *See, e.g.*, Motion at 21-23. However, these arguments go to the merits of the Court's review of the administrator's decision and do not establish that anyone at MetLife took an "advocacy" position or otherwise exhibited bias that would call into question the reasonableness of MetLife's review of plaintiff's claim. *But see Montour*, 588 F.3d at 634 (noting nurse working for administrator advocated for physicians to agree with administrator's decision to deny benefits).

Murphy, plaintiff argues that his bias is demonstrated because plaintiff estimates that Dr. Murphy earns almost $400,000 annually from MetLife. *Id*., at 15-16.  With respect to the conclusions reached by Dr. Topper in his review of other claimants' files, MetLife disputes plaintiff's analysis and contends that Dr. Topper concluded in fifteen reports that claimants had no restrictions/limitations; eight reports showed restrictions/limitations but those would not preclude work; and two reports found claimants could not work.  More fundamentally, MetLife argues there is nothing in these reports that shows bias, because each report is based on the specific facts and evidence of the individual case.  In the absence of plaintiff's citation to case law or statutory support that would allow the Court to view *only* the statistics regarding Dr. Topper's conclusions in 25 reports, ignoring the facts underlying those reports, to reach a determination that his reports demonstrate bias, the Court agrees with defendants.

Moreover, the fact that plaintiff has assumed[11] that Doctors Topper and Murphy earn substantial amounts of money from MetLife annually for their review of MetLife claims, does not automatically establish bias.  Plaintiff cites no ERISA benefits case on this point, much less a case where the fact that an IPC who reviewed a claimant's file earned significant income from the benefits administrator was sufficient by itself to establish bias.  *Cf. Magera v. Lincoln Nat'l Life Ins. Co.*, 2009 U.S. Dist. LEXIS 106440 (M.D. Pa. Nov. 16, 2009) (where reviewers received compensation regardless of the conclusion reached in their reports, possibility for any potential conflict in the review process was lowered).  The Court recognizes that having significant and repeat business with one benefits administrator could – in conjunction with other evidence of structural bias in the process or actual bias in an individual case – call into question the neutrality of an IPC, but plaintiff has not made that showing here.

In sum, the Court will review the administrator's decision with skepticism in light of MetLife's structural conflict, but in the absence of evidence of inadequate claims procedures or a history of biased claim decisions, that conflict is given less weight.

---

[11] Plaintiff takes the number of reports produced to her for a discrete period of time, as well as the amount charged by the doctors for completing specific reports, and extrapolates them to annualized figures.  *See* Plaintiff's Reply at 14-15.

13

## II. Determination of Eligibility by MetLife

According to the terms of the Plan, "Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a Mental or Nervous Disorder or Disease, unless the Disability results from: . . . schizophrenia . . . bipolar disorder . . . dementia; or . . . organic brain disease." AR 27. "Mental or Nervous Disorder or Disease" is defined as "a medical condition of sufficient severity to meet the diagnostic criteria established in the current Diagnostic And Statistical Manual of Mental Disorders ["DSM"]." *Id.*, 28. Plaintiff argues that: (1) the limitation is ambiguous, because it does not clearly specify how to address a disability that is only partly due to a mental or nervous disorder; (2) that the limitation cannot, therefore, be applied if the disability is only partly due to a mental or nervous disorder; and (3) therefore, that MetLife's determination that her monthly benefits were limited to 24 months was arbitrary and capricious. She cites as her primary support a case in which the Ninth Circuit reversed a denial of benefits under the arbitrary and capricious standard because the term "mental disorders" was ambiguous. *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948 (9th Cir. 1993). As such, the Court applied the doctrine of *contra proferentem* to construe the plan in favor of the insured, and remanded for a determination of whether the plaintiff's physical condition (headaches) contributed to his disability, or was a cause or symptom of his depression, in either case entitling him to coverage notwithstanding the "mental disorder" limitation. *Id.*, at 950. Plaintiff also relies on *Schwartz v. Metro. Life Ins. Co.*, 463 F. Supp. 2d 971, 985-86 (D. Ariz. 2006). There the Court found that the term "mental illness" was ambiguously defined as a "mental, emotional or nervous condition of any kind," and since the Plan did not specify whether a condition classified as "mental" is determined by looking to the cause or to the symptoms, the Court construed the term in favor of the insured to cover a disability that arguably resulted from the combined impact of physical and mental conditions. *Id*.

MetLife argues that *Patterson* and *Schwartz* are inapposite here because the term "Mental or Nervous Disorder or Disease" is expressly defined as a condition sufficient to meet the diagnostic criteria in the DSM. AR 28. As such, MetLife argues that *contra proferentem* does not apply and its decision here – finding that plaintiff is only disabled in light of her mental condition and that benefits for that condition were limited to 24 months – should be upheld. *See Simonia v. Hartford Ins. Co.*, 606 F. Supp. 2d 1091 (C.D. Cal. 2009) (finding "mental disorder" defined by DSM not ambiguous and refusing to

14

apply a *contra proferentem* analysis, even where plaintiff contended his mental disorder was caused by physical ailments); *affirmed by Simonia v. Glendale Nissan/Infiniti Disability Plan*, 378 Fed. Appx. 725 (9th Cir. 2010).[12] Met Life also argues that *Patterson* is not relevant because in *Patterson* the plaintiff was disabled because of headaches—a physical condition—and the court was concerned by the determination that headaches caused by mental health problems clearly fall within the mental health limitation. Here, the disability *was* a mental health problem (depression) – which predated her physical conditions – and there was no testimony that her physical conditions were disabling in and of themselves.[13]

The Court agrees with MetLife and finds *Patterson* and *Schwartz* distinguishable because the Plan here provides a precise definition of what constitutes a mental disease or condition. AR 28. Plaintiff's attempt to avoid this result by arguing that her disabling condition is the result of the combined impact of her mental and physical conditions is, therefore, unavailing. On this point, plaintiff also rests a great deal of weight on the fact that Dr. Kirkjian diagnosed plaintiff as having "mood disorder with mixed features of depression and anxiety secondary to cumulative medical condition, code 283.93." AR 633. Plaintiff argues that this DSM diagnosis demonstrates that Ms. Lee's depression was exacerbated by her chronic pain. Plaintiff's Motion at 20. However, the fact that Ms. Lee was diagnosed with a mental disorder under the DSM standards simply serves to bring that diagnosis within the express terms of the Plan's mental disease exclusion.

Finally, reviewing the evidence in the administrative record under the somewhat skeptical abuse of discretion standard required, the Court finds that MetLife's determination should be upheld. As noted above, MetLife had ample evidence – from plaintiff's treating physicians and the IPCs – to conclude she

---

[12] Plaintiff also cites to *Schwartz* where the Court, in conducting a *de novo* review, relied on the testimony of a MetLife employee that a mental condition limitation in the plan at issue was not applied to claimants who were disabled by both mental and physical conditions, though neither alone is disabling. *Id.*, at 985. This discussion in inapposite not only because of the abuse of discretion review in this case, but also as the mental condition limitation at issue in *Schwartz* is not similar to the one at issue here. *See id.*, at 973-74.

[13] Plaintiff repeatedly asserts that her physical symptoms, such as chronic pain and post-concussive syndrome "both operate to impair her independently of her depression." Plaintiff's Motion at 10. However, plaintiff cites no evidence in the AR to support that contention or, more importantly, demonstrate that plaintiff was unable to work because of her physical symptoms.

15

was disabled and unable to work as a result of her mental condition. Plaintiff does not dispute that she was thereby entitled to the 24 months of LTD benefits that MetLife paid her. MetLife also was acting reasonably within its discretion in concluding that plaintiff's physical limitations were not so disabling that they prevented plaintiff from working in "any occupation." While the record has substantial evidence that plaintiff suffered from significant physical ailments following her 2004 accidents, including headaches, post-concussive syndrome and cervical pain which led to her April 2007 surgery (assuming the necessity of that operation was related to the injuries she sustained in 2004) – there is no evidence, even from plaintiff's own treating physicians, that she was disabled and unable to work given those physical ailments. *See* AR502-03 (treating physician Kurkjian noted in November 2008 that plaintiff's inability to work on consistent basis was "a result of the widely recognized symptoms of depression."). The closest plaintiff comes to evidence of physical conditions causing her to be unable to work is the December 10, 2008 opinion of Dr. Behravan which notes that while plaintiff suffers from depression "equally important factors keeping Ms. Lee from work are the combination of her chronic pain syndrome and headaches and [mild] post-concussion syndrome." AR 488-89. The doctor asserts that these conditions provide plaintiff with "some" unspecified restrictions on her ability to work, and that her depression provides her with "additional restrictions." AR 489. This, however, does not establish that plaintiff could not work because of her physical conditions.

Viewing the decision under the somewhat skeptical abuse of discretion standard, the Court finds sufficient evidence to uphold MetLife's decision to limit plaintiff's benefits to 24 months under the mental impairment limitation and its conclusion that plaintiff is not unable to work as a result of her physical conditions.

### III. Summary Judgment on MetLife's Counterclaim

MetLife also moves for summary judgment, arguing that it is entitled to reimbursement for overpayments in the amount of $9,015.09 to offset workers compensation benefits paid during the same period. AR 283–84. Plaintiff opposes judgment on the counterclaim, arguing and submitting evidence in the form of a MetLife "explanation of benefits letter" that MetLife already reduced the amount of benefits it paid plaintiff in light of the workers compensation payments. *See* Declaration of Pamela Lee

16

& Ex. 1 (Docket No. 71).[14]

The Court finds there is a disputed issue of material fact on MetLife's counterclaim precluding summary judgment.[15] The April 23, 2009 MetLife letter in the administrative record does not adequately explain how the additional overpayment amount was calculated. *See* AR 283-84. The April 7, 2009 letter received by Ms. Lee, in contrast, explains the figures MetLife calculated for her "monthly benefit amount," "gross payment," the "excess workers comp" adjustment, and the "net payment." Without additional information from MetLife to support its counterclaim, *e.g.,* a declaration explaining why additional deductions were necessary and how those deductions were calculated, summary judgment is not appropriate.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part defendant and real party in interest's motion for summary judgment and DENIES plaintiff's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: September 19, 2011

SUSAN ILLSTON
United States District Judge

---

[14] MetLife objects to plaintiff's declaration and her exhibit on the grounds that Ms. Lee is not competent to testify about how MetLife calculates monthly benefits and she cannot authenticate the document. The Court OVERRULES MetLife's objection.

[15] Neither party addresses the standard of review the Court should apply to this aspect of MetLife's determination. To the extent abuse of discretion applies, the Court finds that the administrator's decision is not reasonably supported by the administrative record, as Ms. Lee was not provided with an adequate explanation of how MetLife decided to further reduce her award to compensate for alleged overpayments.

17